UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| - v - | : |
| **MELQUAN STEWART,** | :     **24 CR 191 (KPF)** |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# SENTENCING MEMORANDUM
## ON BEHALF OF MELQUAN STEWART

> TAMARA GIWA, ESQ.
> Executive Director
> Federal Defenders of New York
> Attorney for Defendant
> **Melquan Stewart**
> 52 Duane Street, 10th Floor
> New York, NY 10007
> Tel.: (212) 417-8728
> **Amy Gallicchio**, Esq.
> Of Counsel

TO:    Damian Williams, Esq.
        United States Attorney
        Southern District of New York
        26 Federal Plaza, 37th Floor
        New York, NY 10278

Attn:   AUSA Getzel Berger

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

September 25, 2024

**BY ECF AND EMAIL**

Honorable Katherine Polk Failla
United States Courthouse
40 Foley Square
New York, New York 10007

Re: **United States v. Melquan Stewart**
**24 CR 191 (KPF)**

Dear Judge Failla:

I write on behalf of my client, Melquan Stewart, who, at 43-years-old, has survived significant challenges in his life. As a child he lacked security, stability and parental guidance. His father was in prison and his mother was addicted to drugs. Mr. Stewart's early diagnosed mental health conditions largely went untreated, and he developed an alcohol and substance abuse problem at a young age. The dysfunction in Mr. Stewart's childhood undoubtedly influenced some of the poor choices he made as an adult including the decision to possess a firearm. But his arrest and detention in this matter have been "eye opening" and "a kick in the pants." See Exhibit A. Mr. Stewart is ashamed of his conduct and truly sorry about the impact it has had on his family. He is committed to getting back on the right path so that he can be the father, grandfather and positive influence for his children and grandchildren that he never had.

On June 27, 2024, Mr. Stewart appeared before the Court and admitted his guilt pursuant to a plea agreement, to possessing a firearm after having been convicted of a felony, in violation of Title 18, United States Code, Section 922(g)(1).

The Honorable Katherine Polk Failla						September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

As will be explained herein, I submit that the correct Sentencing Guideline range is 24 to 30 months and at the time of sentencing, I intend to ask the Court to impose a sentence of 18 months and a term of supervised release.[1]  Such a sentence, under all of the circumstances, is "sufficient but not greater than necessary" to serve the purposes of sentencing as set out in 18 U.S.C. §3553(a)(2).

### GUIDELINES ANALYSIS

Mr. Stewart pleaded guilty pursuant to a plea agreement in which the parties did not stipulate to the base offense level under the Guidelines.[2]  The Government and Probation contend that Mr. Stewart's 2007 conviction for 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(D), qualifies as a controlled substance offense that directs a base offense level of 20, pursuant to U.S.S.G § 2K2.1(a)(4)(A). Mr. Stewart disagrees and noted his objection to Probation.  He submits that this conviction is a not a controlled substance offense under the relevant Guidelines definitions.

Mr. Stewart contends that he should have a base offense level of 14. See U.S.S.G. § 2K2.1(a)(6).  However, he concedes that he possessed the firearm in connection with another felony offense (U.S.S.G. § 2K2.1(6)(B)) and, pursuant to 2K2.1(c)(1)(A), because the Guidelines are higher for the substantive offense that he attempted to commit (aggravated assault), the Court should apply the Guidelines for aggravated assault under U.S.S.G. § 2A2.2.  Under 2A2.2(b)(2)(A), five levels are added to a base offense level of 14 because the gun was discharged, resulting in

---

[1] The Government contends that the proper Guideline range is 41 to 51 months.  In accordance with the plea agreement, Mr. Stewart agrees and stipulates that, for the purposes of sentencing, the stipulated Guidelines range is 24 to 51 months which represents the lower and upper bounds of the Guidelines as calculated by Mr. Stewart and the Government.  Mr. Stewart further agrees that he will not file a direct appeal or otherwise challenge any sentence within or below the stipulated Guidelines range of 25 to 51 months.

[2] In the plea agreement the parties stipulated that Mr. Stewart has three criminal history points resulting in Criminal History Category II.  Probation reached the same conclusion.

2

The Honorable Katherine Polk Failla                                    September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

an adjusted offense level of 19. Applying a three-level reduction for acceptance of responsibility pursuant to 3E1.1(a) and 3E1.1(b), results in a final offense level of 16 which, at Criminal History Category II, produces a Guideline's range of 24 to 30 months.

### A. Mr. Stewart's 2007 conviction does not qualify as controlled substance offense.

Mr. Stewart's 2007 prior conviction for 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) – marijuana distribution – is a not a controlled substance offense under the relevant Guidelines definitions because 21 U.S.C. § 841(b)(1)(D) at the time of Mr. Stewart's 2007 conviction is overbroad relative to the federal law in place today. At the time of this conviction, the definition of marijuana in the federal Controlled Substances Act ("CSA") included hemp.  Hemp was removed from the definition and Schedule I in 2018.  <u>See</u> Agricultural Improvement Act of 2018, Public Law 115-334, 132 Stat 4490, § 12619 (Dec. 20, 2018) (codified at 21 U.S.C. 802 (16)).  As a result, the pre-2018 (b)(1)(D) statute was overbroad relative to the current statute and controlled substance schedules.

The Guidelines define the term "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b).  The Second Circuit held that a "controlled substance" under U.S.S.G. §4B1.2(b) means "federally controlled substance."  <u>United States v. Townsend</u>, 897 F.3d 66, 74-75 (2d Cir. 2018).  In determining whether a prior offense satisfies this definition, courts apply the categorical approach, "examining the elements of the defendant's conviction and asking whether those elements criminalize any conduct that section 4B1.2(b) does

3

The Honorable Katherine Polk Failla                          September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

not cover." United States v. Chaires, 88 F.4th 172, 177 (2d Cir. 2023). This comparison "often turns on whether the [prior] offense criminalizes even a single substance that federal law does not." Id. at 178. "Under the categorical approach, it does not matter if the defendant's [prior] conviction was in fact premised on a substance that was clearly prohibited by . . . federal narcotics laws, such as heroin or cocaine; the categorical approach looks exclusively at statutory elements and does not inquire into the 'particular controlled substance' underlying the defendant's prior. . . conviction." Id. Finally, in comparing the elements of the prior offense to the federal CSA, this Court must compare (i) the drug schedules in effect at the time of the prior offense to (ii) those in effect either at the time of the instant federal offense conduct or the instant federal sentencing. United States v. Gibson, 55 F.4th 153, 155 (2d Cir. 2022). Thus, if the drug schedules applicable to the prior offense criminalized any substance that the current federal CSA does not, the prior offense is not a "controlled substance offense."[3]

---

[3] The United States Supreme Court's recent ruling in Brown v. United States, 144 S. Ct. 1195 (2024), does not undermine the Gibson mandate. The Court in Brown held that a state drug conviction counts as an ACCA predicate "serious drug offense" if it involved a drug that was on the federal CSA at the time of the state conviction. "ACCA is a recidivist statute that gauges what a defendant's 'history of criminal activity' says about his or her 'culpability and dangerousness.' McNeill v. United States, 563 U.S. 816, 823 (2011). It does this through a 'backward-looking' examination, id., at 820, of 'previous convictions' that bear on dangerousness, §924(e)(1)." Brown, 144 S. Ct. at 1204. Brown is irrelevant in the context of the Guidelines, however, because, as the Supreme Court acknowledged, "Congress has expressly directed courts to apply the Guidelines 'in effect on the date the defendant is sentenced.' 18 U.S.C. §3553(a)(4)(A)(ii). ACCA contains no similar instruction." Id. fn7. Furthermore, in Gibson, the Second Circuit, recognizing that the policy concerns of ACCA are different, considered and rejected the reasoning in McNeill, cited in Brown, in the context of the Guidelines. The Second Circuit found that, "McNeill did not present the same question because . . . the change in North Carolina law only lessened the severity of the punishment prescribed for a defendant's unlawful acts; it did not make a substantive change as to what acts were lawful or unlawful. And while the "culpability and dangerousness" indicated by a defendant's lengthy prior state sentence "does not cease to exist when *a State* reformulates its criminal statutes," 563 U.S. at 823, 131 S.Ct. 2218 (emphasis added), and "[i]t cannot be correct that subsequent changes in *state* law can erase an earlier conviction for ACCA purposes," id. (emphasis added), a defendant's culpability and dangerousness plainly change in the eyes of *federal* law when the conduct

4

The Honorable Katherine Polk Failla                              September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

In 2007, Mr. Stewart was convicted of violating 21 U.S.C. § 841(b)(1)(D), which criminalizes the knowing and intentional manufacture, distribution, or possession with intent to distribute "less than 50 kilograms of marihuana." 21 U.S.C. §§ 841(a); 841(b)(1)(D). See Exhibit B (06-CR-79 (BSJ) (S.D.N.Y.), ECF No. 23 (Judgment in a Criminal Case)).  Here, pursuant to Gibson, we use the categorical approach to compare 841(b)(1)(D) in 2007, the time of the conviction, to 841(b)(1)(D) in 2023 at the time of the offense or, alternatively, in 2024 at the time of sentencing.  The 2007 statute—criminalizing "marijuana"—is plainly overbroad relative to todays (2023 and 2024) because the definition of marijuana included hemp that was removed from schedule I in 2018.

That Mr. Stewart's prior conviction was pursuant to federal law, rather than state law, is of no moment. On its face, U.S.S.G. § 4B1.2(b) defines a controlled substance offense as one "under federal or state law." Compare 18 U.S.C. § 924(e)(2)(A) (differentiating federal CSA offenses from state-law offenses). Indeed, as Judge Sullivan's Chaires concurrence recognized, the deletion of a substance from the federal CSA disqualifies a federal prior predating the deletion as controlled substances offense. See 88 F.4th at 185 (noting that Congress removed hemp from the federal CSA in 2018, then acknowledging: "so long as [a] prior conviction was under a drug schedule (the pre-2018 CSA) that included a substance (hemp) that the current CSA does not, the prior conviction would not meet the requirements of the categorical approach"). At least one district court has already concluded that the 841(b)(1)(C) and 841(b)(1)(D) in effect in 2010 and 2013 were overbroad relative to the statute in effect in 2021, due to the former's criminalization of hemp prior to 2018. United States v. Batiz-Torres, 562 F. Supp. 3d 28, 33 (D. Ariz. 2021).

The United States Attorney's Office in the Eastern District of New York, following Chaires, recently conceded the applicability of the categorical approach to

---

for which he was previously convicted under state law is no longer unlawful under federal law."  Gibson, 55 F.4th at 162.

5

The Honorable Katherine Polk Failla                          September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

prior federal convictions and in <u>United States v. Raheem Boomer</u>, 17-CR-453 (ENV), agreed that a prior 2006 conviction for 21 U.S.C. § (b)(1)(C), did not qualify as a controlled substance offense because in 2006 the federal CSA criminalized substances that were subsequently removed from the Schedules, namely [123I]ioflupane (removed from Schedule II in 2015) and hemp (removed from schedule I in 2018).

For the above reasons, Mr. Stewart's 2007 federal conviction fails to qualify as a controlled substance offense because § 841(b)(1)(D) criminalized conduct that the federal government no longer does. That is the definition of overbroad, and disqualifying. Thus, the Court should reject the Government's position that § 2K2.1 is the controlling Guideline provision.

## A SENTENCE OF 18 MONTHS SERVES THE GOALS OF 18 U.S.C. § 3553(a)

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." <u>United States v. Douglas</u>, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." <u>Id</u>. In <u>United States v. Ministro-Tapia</u>, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. <u>See id</u>. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

There is a wealth of mitigating factors here that warrant a sentence outside of the advisory Guidelines. Below are the §3553 factors and their application to Mr.

6

The Honorable Katherine Polk Failla                                      September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

Stewart in support of a downward variance from the Guidelines and the requested sentence of 18 months and a term of supervised release.

### A. **Mr. Stewart's personal history, mental health and substance abuse challenges warrant a variance.**

Mr. Stewart's childhood was challenging and often unstable.  Mr. Stewart had no real relationship with his father who, as Mr. Stewart recalls, lived a life of crime.  When Mr. Stewart was young, his father was sentenced to life in prison and died while incarcerated.  His mother was addicted to crack cocaine and played little part in his upbringing.  In his interview with Probation, Mr. Stewart recalled one painful incident when his mother shook him off her leg "like you would a pitbull" as he clung to her, in order to get away from him and then sped off in a car.  Fortunately, Mr. Stewart's grandmother stepped in to raise him and was the one constant figure in his life.  Mr. Stewart was devoted to his grandmother and often missed school to care for her when she took ill.  When he discovered that her caretakers were stealing from and abusing her, he dropped out of high school and cared for her full time.  Her passing was very hard on Mr. Stewart, and it left him with little support and greater instability.

Mr. Stewart had behavioral problems as a child, undoubtedly related to the instability at home.  He received limited mental health services and recalls being diagnosed with depression, bipolar disorder and a behavior disorder.  As an adult, and after his release from federal prison in 2011, Mr. Stewart finally received mental health treatment and medication at St. Mark's Institute for Mental Health and attended treatment as required for several years and beyond the term of his probation supervision.

Mr. Stewart's mother, now clean and sober, attributes her son's criminal justice involvement, prior mistakes and poor decision making to the "trauma and challenging life circumstances" he experienced.  <u>See</u> Exhibit C.   Despite the setback

7

The Honorable Katherine Polk Failla                              September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

of the instant arrest, she, Mr. Stewart's partner, and his children are all proud of the progress Mr. Stewart made since his release thirteen years ago and they all report that he was on a positive path.  He was a present and devoted father and doting grandfather.  Mr. Stewart's partner writes, "For someone who didn't have a good example, he really stepped up and took care of his family.  His actions in this case are not representative of who he is today." <u>See</u> Exhibit D. Mr. Stewart's daughter concurs, "He's bettered himself, stayed out of trouble for years to be there with his family, and guided my brother ▇▇▇▇▇▇ with nothing but a positive, supportive, and accepting attitude which helped him graduate high school. My father also helped me every day with my kids so that I could go to work. He would come around and watch them, take them to the zoo, museums, and parks. He would also take them to spend the weekend with him basically every week." <u>See</u> Exhibit E.

  Mr. Stewart's incarceration has taken its toll on his family.  His mother writes, "I am also sick with many health issues. Before my son became incarcerated, he was taking care of me, making sure I was following the right procedures, taking me to my appointments, and doing basically everything around the house. Now, I have a home attendant that helps with some things, but it's nothing like having Melquan around to help me with lifting and moving things, running errands for me, buying groceries, and especially making sure I'm taken care of during the nighttime." Exhibit C.  The hardest hit is probably his son, ▇▇▇▇▇▇ who poignantly writes, "Experiencing important milestones like my graduation, prom, and eighteenth birthday without my father has been incredibly painful. These are significant moments in anyone's life, and I wish he could have been there to celebrate them with me . . . I have felt angry and hurt at times, especially when seeing my father in handcuffs. No one wants to see their family go through that. Nobody, and I mean nobody, wants to ever see their father or anyone in their family in hands cuffs or behind a cage like an animal. While he's made mistakes, I also

8

The Honorable Katherine Polk Failla                September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

recognize that he is human and capable of change. The MDC has been brutal, and I worry about his safety and health in there every day." <u>See</u> Exhibit F.  And Mr. Stewart's grandchildren suffer too when they are unable to sit on his lap or hug him during visits at the MDC.  His granddaughter innocently asks, "why isn't G-pa holding me?"  Exhibit C.  Mr. Stewart's grandchildren are his life and, as his mother reflects, "[T]he love and affection that he has for his grandkids will supersede any impulse to get into trouble. He wants to be an even better grandfather than he was a father. He wants to be there for his daughter's graduation, and not miss another milestone like he had to miss ▮▮▮▮ graduation. He also wants to come to my funeral one day as a free man, not in handcuffs coming from the penitentiary."  <u>Id</u>.

    Mr. Stewart knows that he is responsible for his family's suffering and takes full responsibility for the difficult place he has put them in because of his actions. He admits:

> *"I am disappointed in myself for messing up so badly and landing back in jail.  I am most ashamed of disappointing my family and hurting them. I grew up without a father who was in jail for most of my childhood and then he died in there.  I don't want to be like him. I want to be a positive influence for them.  I love my children and grandchildren and before I was arrested I spent all my time with them.  I feel especially bad and guilty about the fact that my actions caused me to miss my son's graduation from high school.  I know how much that hurt him and it hurt me too.  But I am so proud of him and I promise that I will not miss another important moment in his life.  My grandchildren are everything to me and I have seen them suffer too because of my arrest.  It kills me to see my granddaughter reach out to me to sit on my lap when she visits me at the MDC and I have to refuse her and cant even hold her.   I can only tell them how sorry I am for putting them in this position and promise to never let it happen again."*

Exhibit A.

    As proud as his family has been of his progress in the past thirteen years, it is apparently that he still struggles with mental health issues and substance abuse.

The Honorable Katherine Polk Failla September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

He was abusing marijuana and ecstasy pills up until the day he was arrested. He wants to "get physically and mentally well" and is open to and welcomes treatment and counseling both in a carceral setting and in the community upon his release. And, upon his release, he will have the love and support of his family to help and encourage him. As his mother-in-law puts it, "It takes a village, and Melquan has one waiting for him." See Exhibit G.

### A. Mr. Stewart's crime, while serious, does not demand a sentence of more than 18 months.

There are also mitigating factors surrounding the offense that warrant a downward variance from the applicable guideline range. First and foremost, Mr. Stewart possessed the firearm for the sole purpose of personal protection. And on the night in question, he drew the gun and fired it only after he was physically assaulted by a complete stranger. He pulled the trigger one time in response to the assault and had no intent to kill or seriously injure his assailant. He didn't pursue him as he ran off or continue firing. Mr. Stewart does not have a history of violence and, although he was previously convicted of possession of a firearm in 2005, that offense did not involve any violent conduct.

Nevertheless, Mr. Stewart understands that he was in the wrong for again possessing a firearm and he recognizes the dangers and risks associated with the possession of a firearm regardless of its purpose. He knows that his reaction to the assault was not justified and that he placed innocent bystanders in grave danger. He is sorry for the risk he caused and through his guilty plea, he has demonstrated remorse and has accepted responsibility for his actions.

The Honorable Katherine Polk Failla September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

### B. A sentence of 18 months will reflect the seriousness of the offense, promote respect for the law and provide just punishment.

In addition to the nature and circumstances of the offense and the history and characteristics of the defendant, Section 3553(a)(2) requires the Court to consider the need for the sentence imposed to punish, deter, incapacitate and rehabilitate. For Mr. Stewart, a sentence great than 18 months incarceration is not necessary to serve any of goal of sentencing.

Mr. Stewart has now been detained at the MDC for nearly seven months and has experienced the unjustly punitive and restrictive conditions that are the norm there. He has spent nearly all of those seven months in some form of lock-down due to staff shortages and seemingly endless instances of violence.

By now the Court is well aware of the punitive and restrictive conditions under which inmates at the MDC have been detained. The MDC is unquestionably a dangerous environment and in a state of utter dysfunction. Many have called the conditions there a humanitarian crisis.[4] In a recent sentencing proceeding, United States District Judge Gary R. Brown called the conditions at the MDC "dangerous" and "barbaric."[5] At the MDC, violence is commonplace. In a period of less than 6 weeks, on June 7, 2024, and July 17, 2024, two inmates were stabbed to death on their housing units. In an article published on June 24, 2024, a detainee who was interviewed described frequent stabbings, weapons, lockdowns, misconduct by corrections officers, vermin in the food and inadequate medical care.[6] Mr. Stewart knows the barbarity all too well. He has seen the violence, experienced the

---

[4] See https://finance.yahoo.com/finance/news/several-ny-10-primary-candidates-212500820.html.
[5] United States v. Colucci, No. 23-CR-417 (GRB), 2024 WL 3643857, at *1 (E.D.N.Y. August 5, 2024).
[6] See Courtney Gross, *Inmates Decry conditions in Brooklyn Jail*, NY1 (June 24, 2024), available at https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions.

11

The Honorable Katherine Polk Failla                              September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

isolation, been served the contaminated food and received substandard medical attention.

Courts in this district regularly factor into their sentencing determinations the conditions of confinement existing at the MDC, acknowledging the extremely harsh and punitive nature of lockdowns, among other conditions. Recently Judge Jessee M. Furman noted, "It has gotten to the point that it is routine for judges in this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."[7] He observed that a lockdown is "tantamount to solitary or near-solitary confinement."[8] Another judge similarly observed that lockdown conditions are "basically like solitary confinement with no access to visitors for most of that time."[9] And yet another judge has noted that incarceration under lockdown conditions, particularly during the COVID-19 pandemic, "exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."[10]

Mr. Stewart must, of course, be held responsible for his actions but when fashioning a sentence, I ask the Court to take into consideration the punitive and

---

[7] United States v. Chavez, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024).
[8] Id. at *5. See also *Boxed In: The True Cost of Extreme Isolation in New York's Prisons*, New York Civil Liberties Union, (Oct. 12, 2012), available at: https://www.nyclu.org/sites/default/files/publications/nyclu_boxedin_FINAL.pdf (finding that "[e]xtreme isolation causes emotional and psychological harm, inducing apathy, lethargy, anxiety, depression, despair, rage and uncontrollable impulses, even among the healthy and mentally stable. For the vulnerable, particularly those with mental illness, extreme isolation can be devastating and potentially life-threatening."); Metzner, Jeffrey L, and Jamie Fellner, "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics." 38 J. of the Am. Academy of Psychiatry and the Law vol. 104-104-08 (2010) (noting that "psychological stressors such as isolation can be as clinically distressing as physical torture").
[9] Sentencing Tr. at 17, United States v. Gonzalez, No. 18-CR-669 (JPO) (S.D.N.Y. April 2, 2021), ECF No. 250.
[10] Order, United States v. Romero, No. 15, Cr. 445-18, 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021).

The Honorable Katherine Polk Failla                           September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

inhumane conditions of his confinement. He has already been punished harshly and the Court should give him credit for what he endured. Under the circumstances experienced by Mr. Stewart, a sentence of 18 months will reflect the seriousness of the offense, promote respect for the law and provide just punishment.

**C. A sentence of 18 months will afford adequate deterrence.**

Individual and general deterrence is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." United States v. Brady, 02 CR 1043 (JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). In fact, "determinations regarding general deterrence may be highly subjective, and we must be careful that the individual defendant is not lost in a stereotype." United States v. Cavera, 550 F.3d 180,223 (2d Cir. 2008) (Sotomayor, J., concurring in part). As Judge Jed S. Rakoff has noted, determining how much deterrence is achieved by a certain amount of time in prison is "largely a matter of guesswork, or of taking account of the other factors other than general deterrence…." United States v. Andrew Casperson, 16 Cr. 414 (JSR) (S.D.N.Y. Nov. 4, 2016). There is no way to "measure how much more general deterrence, if any, is achieved by adding two years or five years or ten years to a prison term." Id.

Indeed, each case hinges on its particular circumstances and the consideration of mitigating factors. To be sure, Mr. Stewart committed a serious offense that requires a sentence sufficient to deter him from ever again engaging in such conduct. Just as it has served to punish, the past seven months in the MDC has served to deter not only him but anyone aware of his experience.

In addition, as the Court considers the need for deterrence, it should recognize that the risk of reoffending depends in large part on the treatment Mr. Stewart receives. Whatever period of incarceration the Court imposes, the necessity of providing effective mental health care and substance abuse treatment is clear and essential. In light of the critical lack of staff and the grim state of medical care

The Honorable Katherine Polk Failla                              September 25, 2024
United States v. Melquan Stewart
**24 Cr. 191 (KPF)**

throughout the BOP, it is unlikely that Mr. Stewart will receive all of the necessary substance abuse and mental health treatment he requires. That certainly has proven to be the case at the MDC where the only offer of mental health counseling was a conversation at the door of Mr. Stewart's cell. Mr. Stewart recently reported to me that he was provided a coloring book and pencils as a therapeutic tool.

Given Mr. Stewart's particular set of circumstances, a sentence of 18 months imprisonment and three years of supervision with mental health and substance abuse treatment is sufficient but not greater than necessary to achieve the deterrent effect of sentencing.

### D. A sentence of 18 months will not create unwarranted disparity.

Lastly, regarding parity, 18 U.S.C. § 3553(a)(6) requires the Court to impose a punishment that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Although the guidelines in firearms cases frequently call for a period of incarceration, downward variances in firearms cases are common in this District. For example, in fiscal year 2022, this District imposed a sentence in 144 firearms cases. In those cases, 63.2% of defendants were sentenced below their advisory Guidelines range.[11] Similarly, in fiscal year 2021, 66.7% of the 99 defendants facing gun charges in this District were sentenced below their advisory Guideline range.[12] As such, a sentence below the Guidelines, would be in line with District norms.

---

[11] See Table 10, U.S.S.C. Statistical Information Packet, Fiscal Year 2022, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nys22.pdf.

[12] See Table 10, U.S.S.C. Statistical Information Packet, Fiscal Year 2021, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nys21.pdf.

The Honorable Katherine Polk Failla                September 25, 2024
<u>United States v. Melquan Stewart</u>
**24 Cr. 191 (KPF)**

## CONCLUSION

      For the reasons set forth herein, a sentence of 18 months, and a term of supervised release is more than sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.

      Respectfully submitted,

      */s/ Amy Gallicchio*
      _____

      Amy Gallicchio, Esq.
      Assistant Federal Defender
      Federal Defenders of New York
      212-417-8728

Cc:   AUSA Getzel Berger